Argued and submitted September 28, 2015; Case No. 12-06-32917 reversed and remanded for entry of judgment allowing demurrer, Case No. 12-07-33213 remanded for resentencing and otherwise affirmed, Case No. 12-08-33617 affirmed July 19; petition for reconsideration filed by defense counsel allowed by opinion, October 4, 2017
See 288 Or App 163, 406 P3d 219 (2017)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## SIRGIORGIO SANFORD CLARDY, III,
aka Sirgiorgio Sanford Clardy,
*Defendant-Appellant.*

Multnomah County Circuit Court
12-06-32917, 12-07-33213, 12-08-33617;
A154794 (Control), A154795, A154068

401 P3d 1188

Stephen K. Bushong, Judge. (Judgment in Case No. 12-08-33617)

David O. Ferry, Deputy Public Defender, argued the cause for appellant. With him on the opening brief was Peter

Gartlan, Chief Defender, Office of Public Defense Services. With him on the supplemental briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section. Sirgiorgio Sanford Clardy filed the supplemental brief *pro se*.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Tookey, Presiding Judge, and DeHoog, Judge, and Sercombe, Senior Judge.*

---

## TOOKEY, P. J.

Following two jury trials, on three different cases, defendant was convicted of multiple crimes. In case number 12-06-32917, defendant was convicted of two counts of promoting prostitution, ORS 167.012, and one count each of compelling prostitution, ORS 167.017, second-degree assault, ORS 163.175, first degree robbery, ORS 164.415, fourth-degree assault, ORS 163.160, and tampering with a witness, ORS 162.285. In case number 12-07-33213, defendant was convicted of one count of compelling prostitution, ORS 167.017, and two counts of promoting prostitution, ORS 167.012. In case number 12-08-33617, defendant was convicted of three counts of tampering with a witness, ORS 162.285, and one count of tampering with physical evidence, ORS 162.295.[1]

In this consolidated criminal appeal, defendant appeals three judgments of conviction, raising multiple assignments of error.[2] We write only to address defendant's fifth and eighth assignments of error.[3] In his fifth assignment of error, defendant argues that, under Article I, section 11, of the Oregon Constitution,[4] and the Sixth Amendment to the United States Constitution,[5] the trial court erred when it concluded that he waived his right to counsel, and by denying defendant's request for appointment of counsel following the withdrawal of his final attorney in case numbers

---

[1] Case numbers 12-06-32917 and 12-07-33213 were consolidated and tried together and defendant's judgments of conviction were filed and entered on August 13, 2013. Case number 12-08-33617 was severed and tried before those two other cases and the judgment of conviction was filed and entered on April 4, 2013. Throughout the opinion we refer to case numbers 12-06-32917 and 12-07-33213 as the "Measure 11 and prostitution cases" and case number 12-08-33617 as the "tampering case."

[2] We reject defendant's first and fourth assignments of error without discussion. We also reject without discussion the 11 additional assignments of error that defendant raises in a *pro se* supplemental brief.

[3] Our resolution of defendant's eighth assignment of error obviates the need to address his second, third, sixth, and seventh assignments of error.

[4] Article I, section 11, of the Oregon Constitution provides, in part, "In all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel[.]"

[5] The Sixth Amendment to the United States Constitution provides, in part, "In all criminal prosecutions, the accused shall * * * have the Assistance of Counsel for his defense."

12-06-32917 and 12-07-33213. In defendant's eighth assignment of error, he argues that "[t]he trial court erred when it denied defendant's demurrer to the indictment in case number 12-06-32917." For the reasons that follow, we reject defendant's arguments relating to his fifth assignment of error, but we agree with his arguments relating to his eighth assignment of error. Therefore, in case number 12-06-32917 we reverse and remand for entry of judgment allowing demurrer; in case number 12-07-33213 we remand for resentencing and otherwise affirm; and in case number 12-08-33617 we affirm.

## I.   WAIVER OF DEFENDANT'S RIGHT TO COUNSEL

We begin with defendant's fifth assignment of error. Ultimately, defendant's challenges relate only to the Measure 11 and prostitution cases; however, because the procedural history is intertwined with the tampering case, we describe the history of all three cases. After defendant was indicted for multiple crimes relating to prostitution and arrested, the trial court appointed Wollam to represent defendant. On September 18, 2012, Wollam withdrew from representation due to a conflict of interest. After Wollam's withdrawal, the court appointed James. Because of Wollam's conflict, the court extended the time for all three cases to be tried to December 20, so James would have time to prepare. On November 1, James had to withdraw due to an ethical conflict, but emphasized that "this in no way has—represents any sort of conflict that I have with [defendant]." The court then appointed two attorneys, Pagan and Herivel, and extended the trial date to January 22, 2013.

On January 16, a week before the trial was set to begin, Pagan and Herivel requested to withdraw from the cases due to a "total breakdown of the attorney/client relationship." Before Pagan and Herivel withdrew, Pagan voiced his concern that no attorney would be prepared to try such a complex case by the date scheduled for trial, January 22. Defendant agreed to terminate the representation and requested to represent himself. The court refused to further delay the trial unless defendant waived his statutory speedy trial rights, which defendant refused to do. Defendant proposed that he might be able to retain private counsel, but

once again invoked his right to represent himself. The court allowed Pagan and Herivel to withdraw as defendant's attorneys, but ordered Pagan to stay on as defendant's legal advisor until a new attorney was appointed. Later that day, Dials was appointed as defendant's attorney.

On January 24, the court determined that defendant's 180-day statutory speedy trial right would not compel his release until February 2, and defendant continued to refuse to waive his speedy trial rights to allow Dials more time to prepare for trial. On January 25, Dials requested to withdraw because he would be unable to prepare for trial which was now scheduled for January 28. After being warned about the consequences by the court, defendant again refused to waive his speedy trial right so Dials would have more time to prepare for trial. As a result, the trial court granted Dials's request to withdraw as defense counsel because he would be unable to render defendant effective assistance, but the court required him to stay on as defendant's legal advisor.

On January 28, the court severed defendant's tampering case from defendant's Measure 11 and prostitution cases, and decided to try the tampering case first. The court explained:

> "[I]n this case what has occurred which brought—what brought [defendant] into court today for trial without counsel is a sequence of events in which * * * [t]he Court has appointed counsel on numerous occasions for [defendant]. A number of those * * * attorneys had to withdraw because of conflicts. * * * Shortly before trial, [defendant] asked for his last attorney, Mr. Pagan, to be removed from the case. The Court granted that request. * * * But—but explained * * * to [defendant] that—that getting a new lawyer up to speed at this late date would be difficult, if not impossible. [Defendant] understood that, decided he wanted a new lawyer in any event and the Court granted that request. Then [defendant] asked for a delay in this—in his trial so that his new lawyer could be brought up to speed and be prepared to try the case. As I understand from Presiding Court, the request for a delay was denied after the Court explained to [defendant] that the Court would grant his request for additional time to allow Mr. Dials, at that time

his court-appointed counsel, to be prepared to try this case if [defendant] would agree to remain in custody notwithstanding the statute that requires him to be brought to trial no later than 180 days after being taken into custody on the charges. * * * And [defendant] declined to waive, he wanted to be released, and he made that clear both to Presiding Court and to this Court. He wanted to be released, and given the choice of waiving his—his 180 days so that his counsel could be prepared to try the case, [defendant] declined to waive that * * * which the Court has concluded amounts to a waiver of his right to * * * counsel at the time of trial and that's—that's what [defendant] has done through his conduct."

That afternoon, the jury was selected in the tampering case and the trial court gave defendant another opportunity to waive his speedy trial rights so it could appoint an attorney for him. Defendant refused that invitation once again.

On January 29, following the withdrawal of Dials as defendant's attorney the previous day, the court ordered Pagan and Dials to appear in court. Following a confidential hearing outside of the presence of the district attorney, in which Pagan described defendant's threatening behavior, the court reversed its decision from the previous day that found defendant to have waived his right to counsel, but decided to not reappoint Pagan as defendant's attorney. Accordingly, the court reappointed Dials, and found good cause to continue the tampering trial until February 25, so Dials would have time to prepare for trial.

On February 27, defendant's trial on the tampering charges began. During the tampering trial, both Dials and defendant requested multiple times that Dials be allowed to withdraw as defendant's attorney because of a bad attorney-client relationship and defendant's threatening behavior, but those requests were denied. The court noted that, on the first day of the tampering trial, when defendant was in jail shackles, defendant "attempted to grab Mr. Dial's necktie in what was an apparent attempt to injure his own lawyer." The court ordered that defendant be restrained to a chair because "he may very well attempt to head-butt Mr. Dials, his lawyer, or a witness or a juror * * * and possibly cause a basis for a mistrial through his behavior." On March 1,

the jury found defendant guilty of three counts of tampering with a witness and one count of tampering with physical evidence.

On March 20, Dials requested to withdraw as counsel for defendant's Measure 11 and prostitution cases, which had not yet gone to trial. Defendant stated that he wanted Dials removed from all of the cases, including the tampering case, in which he had not yet been sentenced. The court decided to handle the motion to withdraw on the Measure 11 and prostitution cases separately from the motion to withdraw on the tampering case. After hearing Dials's concerns about defendant's threatening behavior in another confidential hearing, the court allowed Dials to withdraw from the Measure 11 and prostitution cases, but Dials was ordered to continue to represent defendant for sentencing in the tampering case.

The next day, March 21, Menchaca was appointed as defendant's counsel in the Measure 11 and prostitution cases. After working with defendant for less than a week, Menchaca requested to withdraw from defendant's case and defendant agreed that he did not want Menchaca as his attorney. The trial court held a substitution hearing on March 27. At another confidential hearing, after hearing Menchaca's concerns about defendant's threatening behavior, the court concluded that defendant would not be appointed new counsel because he had created "another conflict and attacked the well-being of the attorneys in their ability to represent" him. The court reminded defendant that it had told him on March 21, when Menchaca was appointed, that if he continued to create conflicts with his attorneys, he would find himself in the position of representing himself. The court granted Menchaca's motion to withdraw and informed defendant that "you are now not represented by counsel because of your own actions repetitively *** placing at peril *** the attorneys who have been appointed to you." The court stated:

> "[It is] with great reluctance, that this Court will allow any individual charge[d] with any crime, particularly serious crimes, compelling prostitution or Measure 11 matter with other counts as well, it is with great reluctance that I

would allow unless insistent by the defendant that a defendant go to trial without counsel.

"* * * * *

"[B]ecause of [defendant's] repetitive placing in peril the physical and mental wellbeing of each of the last three attorneys who were appointed, there is no recourse that the Court has but to remove the final counsel appointed and create a situation now where [defendant] will be representing himself at trial."

The court continued:

"So, all efforts have been exhausted more so than with any other defendant that I can recall in recent history to provide counsel to [defendant,] [b]ut he has created the situation repetitively where there is an actual conflict which makes it absolutely intolerable and impossible for appointed counsel to represent him * * * [s]o the case will remain on for trial on April 2 * * * [a]nd [defendant], at this point is representing himself."

On April 1, the trial court held a sentencing hearing in the tampering case with Dials acting as defendant's court-appointed counsel. The court also set the trial date for the Measure 11 and prostitution cases for June 3, so the court would have an opportunity to look into appointing counsel or a legal advisor by the time of the trial.

On April 9, the court appointed Sarre as defendant's legal advisor in the Measure 11 and prostitution cases. On May 31, Sarre filed a motion to withdraw as defendant's legal advisor—three days before the trial was scheduled to begin on June 3. Sarre informed the trial court, "whenever I mentioned to [defendant] well, some of this may not be possible, especially given the time, you may remember I've only been acquainted with this case for about six weeks, essentially [defendant's] response has been and continues to be a torrent of abuse[.]" The state objected to Sarre's withdrawal, stating, "We are 72 hours away from trial. [Defendant] does need some assistance. [Defendant] can take advantage or not. We understand that Mr. Sarre is in a very difficult position * * * [b]ut having him withdraw would not be in the best interests of [the] case[.]" In response, the trial court asked

the state if it had reviewed the affidavit submitted by Sarre, which stated:

> "Except for maybe the initial two-week period immediately following my appointment, [defendant] and I have had an extremely adversarial relationship in which any attempt I make to make the most minor 'advisory' point is countered with insults, threats (veiled and otherwise) and time wasting harangues. [Defendant] is completely hostile to me and regards me as yet another arm of the oppressive state apparatus that in his mind includes the DA's office and the court system.
>
> "\* \* \* \* \*
>
> "In short, I believe that [defendant] is manipulating this process simply to gain traction at a later date if he is convicted of these crimes in which he stands accused. I do not wish to aid [defendant] in this regard. Nor do I want to continue to endure the constant stream of abuse and threats that I hear from [defendant] whenever I attempt to offer even the most insignificant speck of 'legal advice.' I write this having represented several people representing themselves in an advisory role and I have found that even the most anti-social of these people have not sought out legal self-immolation in the way that [defendant] has. I do not find that my presence in this process has any real meaning and that continued association with [defendant] and his case is just further abuse that I do not wish to endure nor do I appreciate. Thus I respectfully petition this court to remove me as 'legal advisor.'"

The state responded that "it's apparent from every time [defendant] has been in court, that [defendant] continues to play games to try to \* \* \* delay his trial." The state pointed out that defendant "had seven different attorneys and was asking to be dismissed based on the fact that we could not bring him to trial within 180 [days.] \* \* \* The court can tell that [defendant] is a very intelligent man. He knows the date, he knows the law[,] \* \* \* [a]ll he is doing is trying to delay." The state requested to "go out to trial like it was set on Monday. And that Mr. Sarre be there to help [defendant] if he chooses it."

The court stated that, "given what the affidavit says, \* \* \* I'm hard-pressed to continue Mr. Sarre as his legal

advisor, which is why I was asking [defendant] if he chooses to use Mr. Sarre as his legal advisor still." The court took the issue of Sarre's status as defendant's legal advisor under advisement and informed the parties that it would email a letter ruling later that day. Ultimately, the court denied Sarre's motion to withdraw as defendant's legal advisor and Sarre assisted defendant throughout his guilt phase and sentencing enhancement phase trials for the Measure 11 and prostitution cases. On June 18, defendant was convicted of four counts of promoting prostitution, two counts of compelling prostitution, second-degree assault, first-degree robbery, fourth-degree assault, and tampering with a witness in the Measure 11 and prostitution cases.

As noted above, in his fifth assignment of error on appeal, defendant argues that, under Article I, section 11, of the Oregon Constitution, and the Sixth Amendment to the United States Constitution, the trial court erred by requiring defendant to represent himself in the Measure 11 and prostitution cases based on an erroneous conclusion that defendant had waived his right to counsel. The state responds that the trial court correctly denied defendant's requests for appointed counsel in the Measure 11 and prostitution cases because, "under the circumstances, and in light of defendant's repeated misconduct," defendant validly waived his right to counsel and the trial court "correctly required defendant to represent himself" from that point forward.

We consider questions of state law first. *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983). The Oregon Supreme Court has held that a criminal defendant may waive the right to counsel protected by Article I, section 11, of the Oregon Constitution only if a trial court finds that (1) "the defendant knows of his or her right;" and (2) "the defendant intentionally relinquishes or abandons that right." *State v. Meyrick*, 313 Or 125, 133, 831 P2d 666 (1992). "Whether [a] defendant validly waived his right to counsel is a question of law that must be reviewed in light of the circumstances particular to the case." *State v. Culver*, 198 Or App 267, 269, 108 P3d 104 (2005) (citing *Meyrick*, 313 Or at 132); *State v. Langley*, 351 Or 652, 666, 273 P3d 901 (2012)

("If a trial court grants a motion to withdraw and does not appoint substitute counsel, thus requiring the defendant to proceed *pro se,* we review for error of law whether the defendant has knowingly and intentionally waived his or her right to counsel."). Because we are reluctant to find that a defendant has waived such a fundamental right, "a valid waiver will not be presumed from a silent record." *Meyrick,* 313 Or at 132. The parties do not discuss whether defendant expressly waived his right to counsel. Rather, their arguments focus on whether defendant waived that right by his conduct.

We must first determine whether defendant understood the risks of proceeding *pro se,* thereby meeting the knowledge component of the waiver before he engaged in misconduct that could result in a waiver. *See State v. Hightower,* 361 Or 412, 417, 393 P3d 224 (2017) ("a valid waiver of the right to counsel must be preceded by a warning concerning the 'dangers and disadvantages of self-representation'" (quoting *Meyrick,* 313 Or at 133)); *State v. Guerrero,* 277 Or App 837, 845, 373 P3d 1127 (2016) ("[I]n order for the advance warning requirement to be meaningful, a defendant must understand the risks and disadvantages of self-representation *before* he engages in the additional misconduct that forms the predicate for a finding of implied waiver." (Emphasis in original.)).

A. *Knowing Waiver of the Right to Counsel Under Article I, Section 11*

In *Meyrick,* the Supreme Court explained the contours of the knowledge component of the waiver analysis:

> "The 'known right' component of a waiver has nothing to do with the 'intentional' component. It refers to a defendant's knowledge and understanding of the right to counsel. It encompasses 'intelligent and competent,' 'intelligently,' and 'knowingly and intelligently.' This is the more expansive of the two components, because a defendant's knowledge and understanding of the right to counsel and of the dangers and disadvantages of self-representation may turn on things other than on what the court tells the defendant, such as the defendant's age, education, and experience and the complexity of the charges and possible defenses."

313 Or at 132 n 8. The Supreme Court went on to explain that a "colloquy on the record between the court and the defendant" that "in some fashion, explains the risks of self-representation is the preferred means of assuring that the defendant understands the risks of self-representation"; however, "Article I, section 11, does not require a catechism by the trial court." *Id.* at 133-34. "Where the preferred colloquy did not occur on the record, or, alternatively, was insufficient to explain the risks of self-representation to the defendant, the court may nevertheless infer, if the totality of the circumstances so demonstrate, that the defendant knew the risks of self-representation." *State v. Howard*, 172 Or App 546, 553, 19 P3d 369, *rev den*, 332 Or 305 (2001). Thus, "[t]he failure of a trial court to impart a particular piece of information to a defendant will not, of itself, require reversal of a conviction if the record as a whole shows that defendant knew of his or her right to counsel[.]" *Meyrick*, 313 Or at 134.

Defendant argues that he did not knowingly waive his right to counsel because the trial court did not advise defendant "that there are specific risks inherent in proceeding without counsel (as required by *Meyrick*)." The state responds that "defendant understood the advantages of representation and the disadvantages of proceeding without counsel," and thus, defendant knew enough about his right to counsel to waive the right knowingly. Because it is evident from the record that defendant knew, at least in a general sense, of his right to counsel, we address only whether the record establishes that he understood that right. *See State v. Erb*, 256 Or App 416, 421, 300 P3d 270 (2013) ("[B]ecause there is no dispute that defendant *knew*, at least in a general sense, of her right to counsel, we address whether the record establishes that defendant *understood* that right." (Emphases in original.)).

Here, we conclude that the totality of the circumstances demonstrates that defendant understood his right to counsel and the risks inherent in proceeding without counsel. "Evidence in the record establishing that the defendant had prior experience with the criminal justice system can support a finding that the defendant knowingly waived

counsel." *State v. Easter*, 241 Or App 574, 584, 249 P3d 991 (2011). At sentencing on the Measure 11 and prostitution cases, defendant testified at length about his extensive criminal history and involvement with the criminal justice system, and the state entered his previous convictions as exhibits for the purposes of sentencing. Between 2004 and 2013, defendant was convicted of eight state felonies and two misdemeanors, and one federal conviction for being a felon in possession of a firearm. Defendant's extensive experience with the criminal justice system in seven cases over the past decade, including two jury trials and 11 convictions, would necessarily have involved significant interactions with defense counsel, prosecutors, judges, and jurors. Thus, defendant's seven separate experiences where he was represented by defense counsel over the past decade supports a finding that defendant understood the value of having counsel representing him at all stages of criminal proceedings.

Likewise, "a defendant's first-hand experience of 'some of the basic things that an attorney could do' provides evidence that a defendant understands the risks of self-representation." *Id.* (quoting *State v. Reynolds*, 224 Or App 411, 419, 198 P3d 432 (2008), *rev den*, 346 Or 158 (2009)). Defendant experienced first-hand what an attorney could do at a jury trial *immediately* before he went to trial on the Measure 11 and prostitution cases when he was represented by Dials in the tampering case. Among other things, defendant observed Dials present an opening statement and closing argument, examine and cross-examine witnesses, make evidentiary objections, and respond to evidentiary objections. Thus, defendant's recent first-hand experience of the services Dials provided in his tampering case also supports an inference that he understood the role of counsel in a jury trial. *Cf. State v. Haines*, 283 Or App 444, 453-54, 388 P3d 365 (2017) (concluding that the defendant did not understand the benefits of having counsel at sentencing following a bench trial when his previous experience with an attorney was at sentencing following a plea deal with the state).

Throughout the cases, when defendant's attorneys withdrew, defendant repeatedly told the trial court that he would be unable to represent himself because he did

not "have the legal knowledge" and requested the court to appoint substitute counsel. In turn, the trial court appointed multiple attorneys to ensure that defendant would be adequately represented. *Cf. Guerrero*, 277 Or App at 849 (concluding that the defendant did not understand the risks of self-representation because, among other things, the defendant "did not have the benefit of representation for any portion of his trial"). Defendant also indicated that he might be able to retain private counsel when Pagan was permitted to withdraw. *See Easter*, 241 Or App at 584 ("[A] defendant's request for retained counsel supports an inference that [the] defendant understands the risks of self-representation."). Those facts suggest that defendant understood the risks of proceeding without counsel.

Finally, defendant's attorneys, the state, and the trial court warned defendant that self-representation would place him at risk because of the complexity of the case and the serious charges he was facing. *See Reynolds*, 224 Or App at 418 (informing the defendant of the charges against him and the maximum penalties was a circumstance that supported a finding that the defendant understood the risks of self-representation); *State v. Howard*, 172 Or App 546, 554, 19 P3d 369, *rev den*, 332 Or 305 (2001) (a colloquy that "plainly warned" the defendant that the "stakes at sentencing would be very high," by explaining the maximum sentence, and explaining, "in specific terms, some of the functions an attorney could perform for [the] defendant," demonstrates that the defendant understood the inherent risks in proceeding without counsel).

Before the Measure 11 and prostitution cases were severed from defendant's tampering case, when Dials moved to withdraw because he would not be able to prepare for the case in "less than a week" due to defendant's refusal to request a continuance, the court warned defendant that

"there are risks in this case proceeding to trial on Monday when you acknowledged and your lawyer has informed you that he cannot be ready for trial. I understand there are about a thousand pages of discovery in this case, it is complicated, * * * [h]e probably isn't even aware yet of all of the witnesses in this case."

The court continued, stating, "so what you need to understand is *** the most serious of these charges," and then it asked the state to explain the charges to defendant. The state advised defendant of the charges against him:

"[T]here are seven Ballot Measure 11 charges *** there is a Rob I, which I think *** he is looking at about 148 months. There are two compelling prostitution, which I think with an upward [departure] he could be looking at 90 months apiece. The assault II is 70 months, but *** with an upward departure, [defendant] could be looking at another 148 months. And there are multiple witness tamperings and promoting [prostitution] which are *** about 90 to 60 months apiece on each of those."

The court wanted to make sure defendant understood that he was "facing considerable time" and asked defendant multiple times if he understood the "risks of going to trial" without a prepared attorney and being unwilling "to waive [his] right, the 60 days [for speedy trial]." The court continued, reminding defendant that "the state has about 30 witnesses, there is a thousand pages of discovery." Defendant responded, "I understand, *** [I] know that we are not able to represent [my]self in an adequate amount of time[.]" The state offered additional warnings, informing defendant that, "if [Dials] were to get more time on this case, he would be able to do a more thorough investigation. He would probably be looking for an expert to testify, there will be additional motions, and [Dials] would be able to determine some strategy." The state continued, warning defendant that "he is looking at registering as a sex offender if convicted." Defendant responded, "yeah, we could do a lot of things, but it's not my fault that *** we had *** all these conflicts." Ultimately, the court granted Dial's request to withdraw and required defendant to proceed *pro se*, but, as noted above, it was only briefly and Dials was re-appointed as defendant's counsel when the cases were severed to allow him more time to prepare for a complex trial on the Measure 11 and prostitution charges. *Cf. Guerrero*, 277 Or App at 850 (concluding that the defendant did not understand the risks of self-representation because, among other things, the trial court did not "warn [the] defendant of the specific disadvantages of representing himself or that self-representation

would be unwise or detrimental to his case"). Those warnings, and defendant's responses, show that defendant understood the risk of representing himself because this was a complex case that would require an attorney's assistance and he was possibly facing a lengthy prison sentence.

In sum, (1) defendant's extensive experience with criminal defense attorneys for a decade in seven different cases, including two jury trials; (2) his recent first-hand experience of observing a criminal defense attorney's role at defendant's own jury trial in the tampering case; (3) his repeated statements that he would be unable to represent himself, his repeated requests for the court to appoint substitute counsel, and his indication that he might retain counsel; and (4) the fact that he was warned about the complexity of his case and that he would be facing a lengthy prison sentence, show that defendant understood his right to counsel and the risks inherent in proceeding without counsel. Thus, we conclude that the totality of the circumstances demonstrates defendant's knowledge and understanding of his right to counsel under Article I, section 11.

B. *Intentional Waiver of Counsel Under Article I, Section 11*

Because we conclude that defendant understood the risks of self-representation and, thus, knew of his right to counsel, we now turn to the question of whether defendant intentionally waived his right to counsel. As noted, the parties do not argue that defendant intentionally expressed his waiver by words, thus, we consider only whether defendant's conduct adequately conveyed defendant's intentional choice to proceed without counsel. Defendant argues that, under the circumstances, "the record was insufficient to find that defendant intended to waive his right to counsel through his conduct" because the trial court did not warn him that "he is at risk of waiving his right to counsel should he continue to engage in misconduct." The state responds that, "under the circumstances, defendant's decision to place attorney Menchaca's mental and physical health in peril was an intentional waiver of his right to counsel."

A defendant's waiver of the right to counsel may be demonstrated by conduct. *Langley*, 351 Or at 669. *Langley* established that three prerequisites must be met to establish

a waiver by conduct: (1) "engaging in repeated misconduct in the attorney-client relationship" that "defeats the ability of counsel to carry out the representation function"; (2) an "'advance warning [to the defendant] that continuation of [his or her] abusive behavior would result in * * * being forced to proceed *pro se*'" and; (3) a reasonable opportunity for the defendant to "present his or her position on the facts in a manner that permits, if appropriate, the safeguarding of confidential communications and trial strategy from public disclosure." *Id.* at 669-73 (quoting Wayne R. LaFave 3 *Criminal Procedure* § 11.4(b), 705-06 nn 29-31 (3d ed 2007)).[6]

In *Langley*, the defendant's court appointed attorneys moved to withdraw on the basis of "irreconcilable differences * * * not of [the defendant's] making." *Id.* at 667. The trial court granted co-counsel McCabe's request to withdraw, but concluded that lead counsel Smith could continue to provide representation and appointed Bergland as the defendant's new co-counsel. *Id.* The trial court gave the defendant the "choice of either (a) affirmatively accepting Smith and Bergland as his counsel, or (b) proceeding *pro se* either with or without the assistance of advisory counsel." *Id.* The defendant proceeded, "on the advice of counsel, to decline to make the proposed choice." *Id.* at 673. The trial "court decided that [the] defendant's refusal to make the offered choice entitled the court to make the choice itself in favor of compelled self-representation, rather than representation by counsel." *Id.*

The Supreme Court held that those circumstances did not amount to a waiver of the right to counsel by conduct for three reasons. First, the defendant's behavior did not amount to misconduct that defeated the ability of counsel to carry out the representation function. "In deciding whether a defendant's misconduct constitutes a waiver of counsel by conduct, a court must bear in mind the distinction between a defendant's noncooperation with appointed counsel and the kind of misconduct that may establish a waiver of counsel by

---

[6] LaFave cites *United States v. Goldberg*, 67 F3d 1092, 1101 (3d Cir 1995) ("[A] 'waiver by conduct' requires that a defendant be warned about the consequences of his conduct, including the risks of proceeding *pro se*." (Citing *Illinois v. Allen*, 397 US 337, 90 S Ct 1057, 25 L Ed 2d 353 (1970) and *Faretta v. California*, 422 US 806, 95 S Ct 2525, 45 L Ed 2d 562 (1975).)).

conduct." *Id.* at 670. That is so because a "defendant has no legal obligation to waive or abandon his objections regarding his appointed counsel or * * * to affirmatively cooperate with counsel." *Id.* at 672. The Supreme Court concluded that the "[d]efendant's decision, on the advice of counsel, to decline to make the proposed choice did not amount to misconduct or manipulation of the court by [the] defendant" and that, by declining to make that proposed choice, the "defendant did not engage in a knowing and intentional waiver by conduct." *Id.* at 673.

Second, the defendant was not given an advance warning that continuation of his behavior would result in being compelled to proceed *pro se.* The trial court had scolded the defendant for his noncooperation with counsel and indicated that he may be compelled at some point to proceed with that counsel notwithstanding his objections about their representation. *Id.* at 670-71. The trial court "did not refer to or otherwise base its decision on any prior warning to [the] defendant that repetition of [the] defendant's manipulative behavior * * * would (or even could) result in the court requiring him to proceed *pro se.*" *Id.* at 671. The Supreme Court concluded that its "review of the record indicates that the required prior warning * * * is lacking in this case." *Id.*

Finally, the trial court did not give the defendant the opportunity to present his position on the facts in a manner that permitted the safeguarding of confidential communications and trial strategy from public disclosure. The trial court instead "based its assumption that [the] defendant's complaints about his lawyers were frivolous only on the evidence proffered by [his attorneys] in their sealed affidavits." *Id.* at 672. Instead of allowing the defendant an opportunity to present his position in a manner that would protect confidential information, the trial court "made it clear that the court would require defendant to disclose all that information in open court" even after the state agreed to a nonpublic disclosure outside of their presence. *Id.* The Supreme Court concluded that it was error for the trial court to force the defendant to disclose that information in open court or otherwise assume that he was engaging in misconduct or

manipulation if the defendant did not make the public disclosure. *Id.* at 672-73.

This case presents a stark contrast to *Langley* in all three respects. First, in this case, defendant did engage in repeated misconduct in his attorney-client relationships that was abusive and defeated the ability of his last three court-appointed lawyers to carry out the representation function. As noted above, the trial court observed that defendant "attempted to grab Mr. Dials's necktie in what was an apparent attempt to injure his own lawyer." Additionally, in the sealed portions of the record, Pagan, Dials, and Menchaca all described the various threats defendant had made to them and defendant was given an opportunity to present his position on the facts privately. Thus, we conclude that defendant engaged in repeated misconduct in the attorney-client relationship that defeated the ability of his last three attorneys to carry out the representation function, as evidenced by his attempt to injure Dials in open court by grabbing his necktie and his repeated abusive conduct by threatening his last three appointed attorneys.

Second, when Menchaca withdrew from the Measure 11 and prostitution cases, the court reminded defendant that it had told him on March 21, when Menchaca was appointed, "that you were given the opportunity to work with, with that new attorney, [and if] you created a conflict such that the new attorney could not continue based upon the reasons that have been stated on the record, a sealed record, that you will find yourself in a position of representing yourself." *See id.* at 671 (A trial court must "refer to or otherwise base its decision on any prior warning to [the] defendant that repetition of [the] defendant's manipulative behavior * * * would (or even could) result in the court requiring him to proceed *pro se*."). Here, the trial court explicitly referred to and based its decision on a prior warning to defendant that repetition of defendant's abusive behavior would result in the court requiring him to proceed *pro se*. Thus, the required prior warning is not lacking in this case.

Finally, as noted above, defendant was given the opportunity to present his position on the facts in a manner

that permitted the safeguarding of confidential communications. When Pagan, Dials, and Menchaca withdrew, defendant was given an opportunity to present his position in confidential hearings outside of the presence of the state. Thus, unlike in *Langley*, the trial court in this case considered information that came directly from defendant and did not err when it concluded that defendant intentionally waived his right to counsel by conduct because of defendant's "repetitive placing in peril the physical and mental well-being of each of the last three attorneys who were appointed."

For the reasons articulated above, we conclude that defendant knowingly and intentionally waived his right to counsel under Article I, section 11 of the Oregon Constitution.

## C. *Waiver of Right to Counsel Under the Sixth Amendment*

As noted above, defendant also argues that he did not waive his right to counsel under the Sixth Amendment. Defendant contends, citing *United States v. Meeks*, 987 F2d 575, 577 (9th Cir), *cert den*, 510 US 919 (1993), that he should have been "advised that he is in danger of waiving his right to counsel if his misconduct continues as well as the dangers of proceeding without counsel." In *Meeks*, the trial court required the defendant to proceed *pro se* because it was "frustrated by the delays caused by Meeks's 'continual changing of attorneys.'" *Id.* at 577. The Ninth Circuit determined that the defendant had not validly waived his right to counsel because the trial court forced him to proceed *pro se* by "denying Meeks' motion to substitute counsel while, at the same time, granting [his attorney's] motion to withdraw" and failing to "make Meeks aware of the dangers of proceeding *pro se*," especially given his history of mental illness. *Id.* at 579. Defendant's reliance on *Meeks* is misplaced for two reasons.

First, as noted above, the trial court in this case explicitly referred to and based its decision on a prior warning to defendant that repetition of defendant's abusive behavior would result in the court requiring him to proceed *pro se*. Defendant's choice to continue his abuse towards Menchaca following that warning resulted in an intentional waiver by

conduct. *See United States v. Sutcliffe*, 505 F3d 944, 955-56 (9th Cir 2007) (the defendant validly waived right to counsel by conduct when trial court based its ruling on prior warnings that he was at risk of waiving his right to counsel).

Second, as we explain above in our discussion of whether defendant understood his right to counsel, the warnings defendant received, in combination with the totality of the circumstances, resulted in a "knowing and intelligent relinquishment or abandonment of a known right or privilege." *Edwards v. Arizona*, 451 US 477, 482, 101 S Ct 1880, 68 L Ed 2d 378 (1981) (knowing and intelligent waiver "depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused'" (quoting *Johnson v. Zerbst*, 304 US 458, 464, 58 S Ct 1019, 82 L Ed 1461 (1938))).

Defendant does not identify any other circumstances that would lead us to reach a different result under the Sixth Amendment. Based on the warnings defendant received and the totality of the circumstances discussed above, which resulted in defendant knowingly and intentionally waiving his right to counsel under Article I, section 11, we conclude that defendant voluntarily, knowingly, and intelligently waived his Sixth Amendment right to counsel "with eyes open." *Faretta v. California*, 422 US 806, 835, 95 S Ct 2525, 45 L Ed 2d 562 (1975).

## D. *Court's Refusal to Appoint New Counsel*

Defendant also argues that "[t]he trial court abused its discretion when it refused to appoint counsel" after defendant was found guilty and renewed his request for counsel to assist him during the enhancement trial and sentencing. The ruling identified by defendant related to the refusal to appoint counsel is the trial court's denial of his motion for appointment of counsel on July 18, the day that the sentencing enhancement trial was set to begin. Defendant contends that "appointment of counsel for enhancement proceedings or sentencing would not necessarily have required disruption of scheduled proceedings." We disagree; the trial court did not abuse its discretion in denying defendant's motion to appoint counsel.

"[B]y waiving the right to counsel, a defendant necessarily asserts the right to self-representation." *Hightower*, 361 Or at 417 (citing *Langley*, 351 Or at 665). "But that does not mean that, once * * * the right to self-representation has been invoked, the correlative right [to counsel] has been forever relinquished." *Id*. However, in light of the "additional interests that are triggered by commencement of trial, any invocation of the right to counsel * * * that occurs after that time is subject to the court's discretion." *Id*. at 418; *Easter*, 241 Or App at 587; *State v. Gale*, 240 Or App 305, 309-10, 246 P3d 50 (2010); *State v. Hug*, 186 Or App 569, 572, 64 P3d 1173, *rev den*, 335 Or 510 (2003). "If the trial court's decision was within the range of legally correct discretionary choices and produced a permissible, legally correct outcome, the trial court did not abuse its discretion." *State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000). In this context, "the record must include some indication of how the trial court actually weighed the relevant competing interests involved for an appellate court to be able to determine whether the trial court abused its discretion." *Hightower*, 361 Or at 421.

"'When assessing a request * * * to obtain new counsel, a trial court must balance a defendant's right to choice of counsel against the need of the public and of all defendants for expedition in the court system.'" *Easter*, 241 Or App at 587 (quoting *Hug*, 186 Or App at 572-73). As we have stated, we have "generally affirmed denials of last-minute requests for continuances to seek new counsel where it appeared that the defendants were in need of new counsel at a late hour due to their own action or inaction." *Hug*, 186 Or App at 573. However, if the state would not be prejudiced by a continuance to obtain new counsel, and the state's need to conclude the case in a timely manner is outweighed by defendant's right to counsel, we have reversed denials of requests for continuances to seek new counsel. *Gale*, 240 Or App at 312.

Here, defendant was convicted in the Measure 11 and prostitution cases on June 18. The parties originally agreed to proceed with the sentencing enhancement trial—which required the guilt-phase jury to hear additional evidence—immediately after trial. Just before the sentencing enhancement trial was to begin, defendant requested,

and received, a setover to July 18. On July 15, three days before the sentencing enhancement trial was set to begin, the trial court heard a motion from Sarre to withdraw as defendant's legal advisor due to defendant's behavior that Sarre characterized as abusive. At the same time, defendant moved for another continuance and told the court that he would be moving for appointment of counsel. The court denied Sarre's motion to withdraw, stating:

> "This case went to trial in June, he was found guilty of most counts. At his request, [defendant's] request, the sentencing was set over because he wanted a PSI completed. Given the—the jury had to be brought back, or is scheduled to be brought back on [the 18th] of this month for the dangerous offender enhancement sentencing trial a month after they have completed the trial. *** [T]here is no way that I could get us in a position to have another legal advisor ready to take on the next phase of the trial, and we have a jury that has been waiting about a month to come back and hear the remainder of the case."

Based on the same concerns, including the fact that the jury had been waiting for a month and was already scheduled to return three days later, the court denied the continuance. On July 18, at the start of the sentencing enhancement trial, defendant moved for appointment of counsel. Referring to its rulings three days earlier, the trial court denied the motion for the same reasons that it had denied Sarre's motion to withdraw and the motion for a continuance.

As we have explained, when defendant moved for a continuance on July 15 and moved for appointment of counsel on July 18, the court had already postponed the sentencing for approximately one month after the guilt phase of the trial. During that month, defendant did not request appointment of counsel; instead, he waited to move for a continuance until three days before the sentencing enhancement trial and moved for appointment of counsel on the day of the sentencing enhancement trial. *See Hug*, 186 Or App at 576 ("defendant had a reasonable amount of time, approximately two months, to retain an attorney"). As the trial court noted, the jury had been waiting for approximately one month to be brought back to complete its work. Accordingly, given the dilatory and last-minute nature of defendant's requests, and

the state's need to timely try the sentencing enhancement to a jury that had already been waiting approximately one month, we conclude that the record reflects that the trial court did not abuse its discretion in denying the motion for another continuance or in denying defendant's motion for appointment of counsel. *See Hightower*, 361 Or at 418 (a trial court may exercise its discretion to deny a motion to appoint counsel that is conditioned on the grant of a continuance or if it has reason to conclude that granting the motion would result in disruption of the proceedings).

## II. DEMURRER TO THE INDICTMENT

In his eighth assignment of error, defendant argues that "[t]he trial court erred when it denied defendant's demurrer to the indictment in case number 12-06-32917." Specifically, defendant contends that "[t]he trial court erred in denying defendant's demurrer because the state failed to plead the basis of joinder" and the error harmed defendant because "none of the three categories of offenses concerned an over-arching scheme that would have permitted admission of all of the evidence regarding the other two offenses had they been tried alone." The state argues that any such error was harmless because the evidence would have been admissible in separate trials "in light of the factual link between defendant's various crimes."

We briefly state the facts underlying defendant's convictions in case number 12-06-32917. In May of 2012, defendant and S "started a romantic relationship." Shortly thereafter, S began working as a prostitute and defendant took pictures of S to post advertisements online for lap dances, massages, and escort services. S testified that defendant directly benefited from her prostitution activities and that defendant would use physical force to keep her from abandoning the relationship and the associated prostitution activities. While defendant and S were living in a hotel, another victim, O, negotiated with S for 25 minutes of sexual activity for $185. After the 25 minutes elapsed, defendant entered the room and told O that "time was up," and told S that he was going to "beat [her] ass." O took his money and ran to his car. Defendant chased O out to O's car, punched and kicked him, and took the $185 from O.

While defendant was chasing O, S fled to another hotel room occupied by her friend. Defendant tracked S down and punched, kicked, and choked S, and tried to burn her hair. Eventually, S was able to contact the police and defendant was arrested. After defendant was arrested, defendant sent a letter from jail to his friend, Eldridge, in which defendant asked Eldridge to claim that he witnessed the altercation between defendant and O. In that letter, defendant asked Eldridge to contact defendant's attorney to tell the attorney that O punched defendant first, and that O attacked defendant with a knife when defendant confronted O about not paying for "a lap dance or something."

Defendant was subsequently indicted for multiple crimes. The indictment in case number 12-06-32917 charged defendant with committing six counts of promoting prostitution and two counts of compelling prostitution. Additionally, with respect to O, defendant was charged with one count of second-degree assault, two counts of first-degree robbery, two counts of second-degree robbery, and two counts of third-degree robbery. Defendant was also charged with committing one count of fourth-degree assault against S, and one count of tampering with a witness for the letter that defendant sent to Eldridge.

Defendant filed a "demurrer to the indictment for violation of ORS 132.560," arguing that "[t]he failure to plead any of the three requirements of ORS 132.560 on the face of the indictment is fatal, and the indictment must be dismissed."[7] Defendant, acting *pro se*, also argued

---

[7] ORS 135.630(2) provides, in part, that a "defendant may demur to the [indictment] when it appears on the face thereof" that "it does not substantially conform to the requirements of *** ORS 132.560." In turn, ORS 132.560(1)(b) provides:

"A charging instrument must charge but one offense, and in one form only except that:

"* * * * *

"(b) Two or more offenses may be charged in the same charging instrument in a separate count for each offense if the offenses charged are alleged to have been committed by the same person and are:

"(A) Of the same or similar character;

"(B) Based on the same act or transaction; or

"(C) Based on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

that the court should allow the demurrer, and dismiss and then sever the charges. The state responded that the charges were "properly joined" in the indictment and that defendant "has not set forth any facts to show that they should not be joined * * * or severed and no authority for the charges to be dismissed." The court disallowed defendant's demurrer.

On appeal, defendant argues that the trial court erred when it disallowed his demurrer to the indictment. We held in *State v. Poston*, 277 Or App 137, 144-45, 370 P3d 904 (2016), *adh'd to on recons*, 285 Or App 750 399 P3d 488 (2017), that, in order to meet the requirements of ORS 132.560, "the state [is] required to allege in the charging instrument the basis for the joinder of the crimes that are charged in it, whether by alleging the basis for the joinder in the language of the joinder statute, or by alleging facts sufficient to establish compliance with the joinder statute." The state concedes, and we agree, that "the indictment at issue did not comply with the rule of law that *Poston* announced." Thus, the trial court erred when it disallowed defendant's demurrer to the indictment.

As required by Article VII (Amended), section 3, of the Oregon Constitution, we must consider whether the trial court's error in disallowing defendant's demurrer was harmless because it had little likelihood of affecting the verdict. *Poston*, 277 Or App at 145; *see also State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) ("Oregon's constitutional test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict?"). As we stated in *Poston* and reaffirmed on reconsideration in that case, "whether improper joinder of charges affected the verdict depends on whether joinder led to the admission of evidence that would not have been admissible but for the [erroneous] joinder * * * and, if so, whether that evidence affected the verdict on those charges." 277 Or App at 145; *see also State v. Poston*, 285 Or App 750, 754-55, 399 P3d 488 (2017) ("Because the charges were not lawfully joined in the indictment, defendant was prejudiced in the manner that we identified, that is, by proceeding to trial on charges of promoting prostitution and identity theft that

were not lawfully joined for trial."). In other words, to conclude that the erroneous joinder was harmless—that it had little likelihood of affecting the verdict on a charge or properly joined group of charges—we must be able to determine that all of the evidence that was admitted at trial to prove other, improperly joined, charges would "have been admissible" in a hypothetical trial on the charge or group of charges alone. 277 Or App at 145.

In *Poston*, the defendant was convicted, after a jury trial, of several counts each of promoting prostitution and identity theft. *Id.* at 140. The defendant was initially arrested on a probation violation and incarcerated at the Inverness Jail, where the Multnomah County Sheriff's Office monitored the defendant's phone calls, mail, and inmate account. *Id.* at 138. The defendant used the personal identification numbers of other inmates to place phone calls to the victims to instruct them on how to conduct their prostitution activities and to tell them that they needed to deposit money from their prostitution activities in the defendant's inmate account. *Id.* at 138-39. To prove the promoting prostitution charges, the state was required to prove that defendant, "'with intent to promote prostitution, * * * knowingly * * * [r]eceive[d] or agree[d] to receive money or other property * * * pursuant to an agreement or understanding that the money or other property is derived from a prostitution activity.'" *Id.* at 139 n 1 (quoting ORS 167.012(1)).

We held that the indictment was insufficient to allow joinder of the promoting-prostitution charges with the identity-theft charges under ORS 132.560. *Id.* at 144-45. To determine whether the erroneous joinder was harmless, we considered whether the evidence that had actually been presented at the trial on the joined charges would have been "admissible" in two hypothetical trials—one on the promoting-prostitution charges and one on the identity-theft charges. *Id.* at 145-46.

We first concluded that the erroneous joinder was harmless with respect to the promoting-prostitution charges because all of the evidence of identity theft would have been admissible "to show that, when asking the victims to place

money in his inmate account, [the defendant] knew that he was asking them to send him money that they obtained through prostitution activity." *Id.* at 146. That is, the fact that the defendant had used the personal identification numbers of other inmates to make the telephone calls to the victims—strongly suggesting that he sought to hide his identity from anyone who might be monitoring the calls— was probative of the defendant's knowledge that the money he obtained from the victims as a result of the telephone calls was "'derived from a prostitution activity.'" *Id.* at 139 n 1 (quoting ORS 167.012(1)). That probative evidence of guilt, which carried a comparatively low risk of unfair prejudice, would very likely have been admitted at a trial on the promoting-prostitution charges alone.

By contrast, we concluded that the erroneous joinder was not harmless with respect to the identity-theft charges because we could not "conclude that the evidence bearing on the promoting-prostitution counts would have been admissible at a trial in which defendant was charged only with identity theft." *Id.* at 146. It is possible that the promoting-prostitution evidence—evidence of the content of the telephone calls that the defendant made using the personal identification numbers of other inmates—would be relevant, at least, to the defendant's motive for committing identity theft. Nevertheless, we could not conclude that that evidence would very likely have been admitted "at a trial in which defendant was charged only with identity theft" because its probative value might have been relatively low in light of the other available evidence of identity theft, and its risk of unfair prejudice would be comparatively high. *Id.*

Our analysis in *Poston* demonstrates that evidence presented at trial on erroneously joined charges would be "admissible," as we used that term in *Poston*, in a hypothetical trial on each charge or properly joined group of charges, only when (1) each item of evidence that was actually presented could have been admitted in the hypothetical trial under a legally correct evidentiary analysis and (2) it is implausible that, had the defendant objected under OEC 403 or raised some other objection invoking the trial court's

discretion, the trial court would have excluded that evidence in the hypothetical trial.[8]

Applying that analysis here, we conclude that the erroneous joinder was not harmless as to any of the charges in case number 12-06-32917. Defendant argues that not all of the evidence actually presented at trial would have been relevant in hypothetical separate trials on each group of charges and, furthermore, that it is not implausible that a trial court would have excluded some of the otherwise relevant evidence under OEC 403. We agree. We cannot say that, if defendant had been indicted and tried separately on the prostitution-related charges, the robbery charges, the assault charges, and the witness-tampering charge, all of the evidence that was actually presented at trial would have been admissible in any one of the hypothetical trials. Accordingly, the erroneous disallowance of defendant's demurrer was not harmless.

## III. CONCLUSION

Defendant validly waived his right to counsel under Article I, section 11 of the Oregon Constitution and the Sixth Amendment to the United States Constitution. The trial court did not abuse its discretion when it required defendant to proceed *pro se* and when it denied his further request for counsel in the sentencing enhancement trial for the Measure 11 and prostitution cases. The trial court erred when it disallowed defendant's demurrer to the indictment in case number 12-06-32917 and that error was not harmless.

---

[8] Our explanation does not foreclose the possibility that, in some cases, the evidence that was introduced to prove the improperly joined charge or charges might be so benign that its admission has little likelihood of affecting the verdict on the other charge or charges. *See, e.g., State v. McColly*, 286 Or App 168, 173-74, 399 P3d 1045 (2017) (noting that charges of menacing and harassment "are not so inflammatory that identifying those charges [by name] is more prejudicial than informing the jury that defendant was charged with unspecified misdemeanors"). However, because evidence introduced to prove improperly joined charges will usually involve other criminal acts by the defendant, such cases may be rare. *See, e.g., State v. Williams*, 357 Or 1, 20, 346 P3d 455 (2015) (noting that evidence of a defendant's other bad acts, particularly when they lack legitimate probative value in the context of the case, presents a "substantial" "risk that the jury may conclude improperly that the defendant has acted in accordance with past acts on the occasion of the charged crime").

Case number 12-06-32917 reversed and remanded for entry of judgment allowing demurrer. Case number 12-07-33213 remanded for resentencing and otherwise affirmed. Case number 12-08-33617 affirmed.[9]

---

[9] Initially, all three cases were consolidated and joined for trial. However, as noted above, the tampering case was severed and defendant was tried and sentenced in that case before he was tried and sentenced in the Measure 11 and prostitution cases. Because the Measure 11 case, 12-06-32917, is being reversed and remanded for a judgment of dismissal, the prostitution case, 12-07-33213, must be remanded for resentencing. *See State v. Sheikh-Nur*, 285 Or App 529, 531, 398 P3d 472 (2017) ("ORS 138.222(5)(b) requires resentencing of all of the convictions in the consolidated cases."). Our disposition does not affect the validity of the judgment of conviction in the tampering case.