Argued and submitted October 29, 2014; convictions on Counts 1, 2, and 3 reversed and remanded, convictions on Counts 5 and 6 reversed, otherwise affirmed August 2, 2017

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## CHRISTOPHER E. MILLER,
aka Christopher Eugene Miller,
*Defendant-Appellant.*

Multnomah County Circuit Court
120733133; A153987

401 P3d 229

Neil F. Byl, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Peenesh H. Shah, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Hadlock, Chief Judge, and Egan, Judge.*

---

* Hadlock, C. J., *vice* Nakamoto, J. pro tempore.

**EGAN, J.**

Defendant appeals a judgment of conviction for attempted murder (Count 1), ORS 163.115; attempted assault in the first degree (Count 2), ORS 163.185; unlawful use of a weapon (Count 3), ORS 166.220; failure to perform the duties of a driver when property is damaged (Count 5), ORS 811.700; and unlawful possession of a firearm (Count 6), ORS 166.250.[1] Defendant assigns error to the trial court's denial of his demurrer to the indictment based on improper joinder of charges. We conclude that Counts 5 and 6 were not properly joined in the indictment with Counts 1 through 3 and, thus, the trial court erred in denying defendant's demurrer. However, that error was not harmless with respect only to Counts 5 and 6, and we therefore reverse only those counts. Defendant also contends that the trial court erred in admitting police recordings of two witnesses' statements as evidence under OEC 803(5),[2] the past recollection recorded exception to the hearsay rule (OEC 802). We conclude that, because the two witnesses did not "make or adopt" their recorded statements, the trial court erred in admitting the recordings under OEC 803(5) and that error was not harmless with respect to defendant's convictions on Counts 1, 2, and 3. We reject defendant's other assignment of error without discussion. Accordingly, we reverse and remand the convictions on Counts 1, 2, and 3, and we reverse the convictions on Counts 5 and 6. Otherwise, we affirm.

We apply a two-part standard of review to a trial court evidentiary ruling that a statement fits within an

---

[1] Defendant was also charged with obliteration or change of identification number on firearms (Count 4), ORS 166.450, of which he was ultimately acquitted.

[2] OEC 803(5) provides:

"The following are not excluded by [OEC 802], even though the declarant is available as a witness:

"* * * * *

"A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the memory of the witness and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party."

exception to the hearsay rule. *State v. Cunningham*, 337 Or 528, 538-39, 99 P3d 271 (2004). We will uphold the trial court's preliminary factual determinations if any evidence in the record supports them. *Id.* at 537. However, we review for legal error the trial court's ultimate legal conclusion on whether the hearsay statement is admissible under an exception to the hearsay rule. *Id.* at 538. Also, in the absence of express findings, we generally presume that the trial court decided disputed factual issues consistently with its ultimate conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). We set out the facts in accordance with that standard.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. *Background Facts*

Defendant's girlfriend was at a family party when she showed her grandmother her new car. When the grandmother went outside to look at the car, defendant was standing nearby with two of his friends—Brown and Ritmiller. Defendant and the grandmother began to argue. Then the grandmother walked away toward the house while defendant "yell[ed] and cuss[ed]" at her. When the grandmother returned to the house, she told her grandson, Royal, what had happened, and Royal left the house to talk to defendant.

The grandmother heard Royal and defendant yelling at each other angrily. Then she heard Royal say, "He got a gun. He's getting ready to shoot." One shot was fired. The grandmother saw Royal running toward the house and defendant "standing up like he had [a gun] in his hand," but she could not determine whether defendant was shooting at Royal or firing a warning shot. Defendant and his two friends, Brown and Ritmiller, got in the car and defendant drove away.

Officer Porath and his partner were patrolling the area near where the gunshot was fired. They followed a white sedan that was speeding and watched it hit a parked car before it came to a stop. When Porath came up to the stopped car, the driver's door was open and the driver, defendant, was running away. The two passengers, Brown and Ritmiller, remained inside or near the car. Porath found a

gun in the door panel of the car with one round in the chamber. On the street where the shooting had occurred, another officer found a shell casing that matched the caliber of the round found in the gun.

That night, Brown and Ritmiller were interviewed by two detectives.

## B. *Brown's Recorded Interview with Police*

During Brown's interview with the police, a detective told Brown that he was a "fair" person and, if people are being "honest" with him, he tries to do what he can, but that, if people lead him down another direction and waste his time, he would have to "start digging" and "stuff like that" and that would not be "cool." One of the detectives also asked Brown if he was "on paper,"[3] and Brown shook his head no. The detective then asked Brown if he was "looking to get on paper" and Brown again shook his head no.

Before asking Brown who fired the gun, the detective told Brown repeatedly that Brown "needed to be honest with him" and that he needed to start making some "decisions." The detective also told Brown that defendant had made some bad decisions, "but that what [Brown] told the detectives could help him and it was not going to hurt defendant any more than he was already hurt." Brown did not identify who fired the gun.

The detective then asked Brown, "[H]ow was the gun being held?" and reiterated that Brown needed to be "honest" with him. Brown told the detectives that defendant had said, "On my dead homies, whoever comes out of that house to me talking shit is going to get busted." Brown demonstrated how the shooter shot the gun by pointing straight ahead. The detective mimicked Brown, pointing straight ahead, and asked Brown again if the shooter pointed the gun like he had just demonstrated. Brown again showed the detectives how the shooter had held the gun and pointed his arm angled upward. Brown said that the shooter was not trying to aim "right" because he was very close, about 20 yards away, and he could have shot the guy. Brown

---

[3] We understand "on paper" to refer to having a criminal record.

demonstrated how the shooter shot the gun one last time by pointing his fist in the air with his elbow bent upwards.

## C.  *Ritmiller's Recorded Interview with Police*

The police interviewed Ritmiller after Brown's interview ended. At the start of the interview, Ritmiller explained that he was getting his gang-affiliated tattoo removed, and that he was trying to get out of the gang, change his lifestyle, spend more time with his daughter, and stay out of the way. The detective responded that Ritmiller did not stay out of the way that night and that he was with "at least one knucklehead." Then the detective told Ritmiller that he was fair and that, if Ritmiller was honest, he would do the best he could for him.

Ritmiller described an abbreviated version of what had happened and the detective applied pressure to Ritmiller, saying, "Here's your chance to prove to me, to your [probation officer], and to everybody else that you're trying to do the right thing. Okay? Because this could go a bunch of different ways. I don't know whether you helped [defendant] out on this deal that happened up there." The detective also said that Ritmiller needed to be thinking about himself right now and that whatever he said right now would have more of an influence on him than on defendant.

Ritmiller then described what had happened that day in greater detail. Ritmiller said that defendant had repeatedly told his girlfriend, "Bitch, anybody come outside, I'm going to smoke them," and had grabbed a gun out of his car. Ritmiller did not know how defendant was holding the gun—it happened quickly. He saw Royal drop to the ground. Ritmiller thought defendant had shot Royal. Ritmiller and Brown got in the car and defendant drove it away. Ritmiller reported that defendant had said, "I thought I popped him."

Ritmiller asked the detective if the detective had talked to Ritmiller's probation officer. The detective responded, "Not yet," but stated that he would tell the probation officer that Ritmiller "came around" and gave a statement about what had happened. Before the interview ended, the detective again stated that he would tell Ritmiller's probation officer that he "got along" with Ritmiller.

## D. *The Charges and Defendant's Demurrer*

Defendant was charged by indictment with attempted murder with a firearm (Count 1), ORS 163.115; attempted assault in the first degree with a firearm (Count 2), ORS 163.185; unlawful use of a weapon (Count 3), ORS 166.220; obliteration or change of identification number on firearms (Count 4), ORS 166.450; failure to perform the duties of a driver when property is damaged (Count 5), ORS 811.700; and unlawful possession of a firearm (Count 6), ORS 166.250. Each count specified that defendant committed the particular crime "on or about July 14, 2012, in the County of Multnomah, State of Oregon." Additionally, Counts 1 through 3 specified that Royal was the victim for those charges.

Defendant waived a jury and tried his case to the court. Prior to trial, however, defendant demurred to the indictment, which the trial court denied. At trial, defendant did not dispute that he had fired a gun; instead, he claimed that he had intended to fire a warning shot that was not meant to hit anyone. The state called Brown and Ritmiller as witnesses to refute defendant's claim.

## E. *Brown's Testimony at Trial*

Brown testified on behalf of the state. Brown stated that he recalled getting off a bus with Ritmiller on the day of the shooting because defendant was going to give them a ride. He also recalled that, after he heard one gunshot, he got into the car but he did not know who had shot the gun. Brown also said that, after the car stopped, he spoke to the police, but he could not remember everything he told them because he was under the influence of marijuana. He testified that he did remember telling the police that the gun was not his and describing what the gun looked like.

The state then asked Brown if listening to his recorded interview would help him refresh his recollection, and the court agreed that Brown should listen to his recorded interview:

"[THE STATE]: Do you remember telling Officer Burley the next person out of the house, I'm going to bust on him.

"[BROWN]: Why would I tell him that I didn't have a gun.

"[THE STATE]: Do you think it would help if you listened to your interview that was recorded?

"* * * * *

"[BROWN]: I already told the investigator I didn't want to have anything to do with this.

"[THE STATE]: *** So, Your Honor, I think what we should do at this point is take a break for today. We'll take [Brown] to a conference room, we'll let him watch and listen to his video, and we'll bring him back tomorrow.

"[THE COURT]: Okay.

"[DEFENSE COUNSEL]: Is that for the purposes of refreshing his recollection?

"[THE STATE]: Yep.

"[DEFENSE COUNSEL]: Does the witness think that that will help refresh his recollection?

"* * * * *

"[BROWN]: I don't want anything to do with this, so why are you guys forcing me to (indiscernible)?

"[THE COURT]: Well, I'll take this on, Mr. Brown."

The court told Brown that he was there by court order, was required to answer questions, and could be held in contempt if he did not comply.

Defense counsel asked that Brown listen to the recorded interview; the state responded that it would offer the recorded interview into evidence if it did not refresh Brown's recollection:

"[DEFENSE COUNSEL]: I would ask that [the state] have [Brown] listen to it. That's what [the state] wanted to do. But I don't want it on the record. It's offered for impeachment purposes. It can't be used as substantive evidence anyway, so.

"* * * * *

"[THE STATE]: If it doesn't refresh his recollection, then we'll be going to the recorded version, since the officers made the recording. So it will be offered in any event."

The next day, the state asked Brown if he had a better memory of the events after listening to his recorded interview:

"[THE STATE]:  Mr. Brown, do you—having had the night now to think about how you're here today, how you were here yesterday, do you have a better memory of what happened back in July?

"[BROWN]:  Nope, and (indiscernible) not saying anything without an attorney or my mother's presence.

"* * * * *

"[BROWN]:  Why I'm back today. It's the same answer, going to be (indiscernible). I don't remember.

"[THE COURT]:  You're saying that you don't remember, and the state has an opportunity to refresh your recollection and that's what they want to do today, okay?"

Thereafter, the state began to play the recording.

In aid of an objection, defense counsel asked if they could stop the recording and ask Brown whether it refreshed his recollection:

"[DEFENSE COUNSEL]:  This isn't being offered as substantive evidence. Maybe we could inquire at this point if this has helped refresh the witness' recollection, and then he can give statements under oath instead of coerced statements from the police interrogation room as evidence?

"[THE COURT]:  Well, I think the state's entitled to show it all to him before asking if it refreshes his recollection. You know, maybe—I don't know what's in this video. So I'm not going to—she can show the entire video and ask if it refreshes and we'll go from there.

"[DEFENSE COUNSEL]:  Well, I'm objecting to the procedure and I'm objecting to the Court receiving anything from the video as substantive evidence in the case.

"[THE COURT]:  Your objection's noted. It's not been offered. Go ahead."

The state then played the remainder of the recording. Afterward, the state asked Brown if the recording helped him remember the incident. Brown responded:

"[BROWN]:   Not from what I see there. It's all peer pressure.

"*  *  *  *  *

"[BROWN]:   Like being forced to.

"[THE STATE]:   So do you remember, now that you're sitting in this chair and actually (indiscernible) to watch that, does that help you remember back what happened in July?

"[BROWN]:   I mean (indiscernible) a year ago.

"[THE STATE]:   Is it still too long to remember?

"[BROWN]:   Yeah."

The state offered the recorded interview as Brown's past recollection recorded under OEC 803(5), and defendant objected that the state had not demonstrated that it could be offered under that rule.

"[DEFENSE COUNSEL]:   * * * This witness isn't adopting that statement or even saying that it was accurate at the time.

"*  *  *  *  *

"[DEFENSE COUNSEL]:   I just don't think it's proper for [the] state to offer that statement made in the interrogation room as substantive evidence.

"*  *  *  *  *

"[THE STATE]:   * * * [T]he rules do allow that it be admitted. It is a recorded recollection that was made on a matter when the witness once knew about it and now cannot recall.

"It was made or adopted by the witness when the matter was fresh in his memory and at the time, he even demonstrated visually by standing up. So it was clear that his—at the time, he did have an accurate—accurate recollection of what was going on and the knowledge of the—of the incident."

Ultimately, the court allowed Brown's recorded statements to be admitted as evidence.

### F. *Ritmiller's Testimony at Trial*

Ritmiller also testified at trial on behalf of the state. The state asked Ritmiller whether he remembered the day last summer when he was with defendant and a gun went off. Ritmiller responded, "I can't recall exactly that day. Like I had mentioned, it was a long time ago and it's about to be a new summer."

"[THE STATE]:   * * * Do you remember there being an altercation between [defendant] and another guy * * * ? * * *

"[RITMILLER]:   * * * [I]t was a long time ago. I recall it being in the summer, but like I said, it was a long time ago.

"[THE STATE]:   You just don't remember?

"[RITMILLER]:   * * * I have a severe cocaine and alcohol issue and I can't even say—two weeks ago would be hard to remember, so."

The state then played Ritmiller's recorded interview with the police. Afterwards, the state asked Ritmiller if listening to the recording had refreshed his memory. Ritmiller responded, "I mean, you have that video. You know, I'm confused in why am I here." The state then explained to Ritmiller that the point of having the video was for him to watch it and determine whether that helped him remember what had happened that day.

"[RITMILLER]:   The video tells it all. I mean, there's nothing more to say than that.

"[THE STATE]:   So the video is what you remembered on that day happening. (Indiscernible).

"[RITMILLER]:   (Indiscernible) listen to the whole thing, so (indiscernible).

"* * * * *

"[THE STATE]:   Well, let me ask a different question. Tell me what you remember about the (indiscernible) with the grandma.

"[RITMILLER]:   I remember—it's—it's—as far as—it's hard to remember. I mean, from listening to what I was based off that, I mean, it sounded like the grandma—I

was saying the grandma instigated the issue and that she had went and got somebody that tried to run up on—fight [defendant].

"[THE STATE]: Okay. So just to clarify. It sounds like your testimony right now was based on what you remember of the day of this incident (indiscernible) recording; is that right? Is that—the recording (indiscernible) best memory you have of this? Can you answer out loud?

"[RITMILLER]: Yes.

"[THE STATE]: The state offers this exhibit as past recollection recorded.

"[DEFENSE COUNSEL]: The same objection I had for Mr. Brown's statement, Your Honor.

"[THE COURT]: Okay. And my ruling will be the same."

Thus, the court allowed Ritmiller's recorded statements to be admitted as evidence under OEC 803(5).

Ritmiller also confirmed, consistent with what he had said in his recorded interview with the police, that he did not see how defendant was holding the gun, because everything happened so fast. But he testified that he thought it was a warning shot.

On redirect, the state noted that Ritmiller seemed to "have a pretty good memory about the shooting" and began to ask Ritmiller questions about what had happened before the shooting. When Ritmiller responded, the state asked, "So now you remember *** right?" Defense counsel then objected and asked:

"[DEFENSE COUNSEL]: I think that the prosecutor might have put words in your mouth when she said I jogged your memory. Was it the—the—watching that tape that you were referring to?

"[RITMILLER]: Listening to that tape is what pretty much filled me in on everything."

The state continued to ask Ritmiller questions about what had happened on the day of the shooting. Ritmiller was able to recall some of the events, but not others. At one point Ritmiller stated, "I'm trying to recall what was off the video."

As noted, the trial court convicted defendant of attempted murder, attempted assault in the first degree, unlawful use of a weapon, failure to perform the duties of a driver when property is damaged, and unlawful possession of a firearm. The trial court made the following findings with regard to those counts:

> "[A]s to Count 1, Attempted Murder, I am finding [defendant] guilty based on the evidence that I heard. I didn't hear any credible evidence to dispute the intent that I heard through the other witnesses that I found credible. So I am going to enter a guilty finding on Count 1.

> "Likewise, Count 2 and Count 3. Count 5 is Failure to Perform the Duties of a Driver, guilty. And Count 6 is guilty. [The state] actually did charge the right one. It was—I went back and looked at the indictment and it's possess the handgun, concealed and readily accessible to the defendant within a vehicle. So [defendant is] guilty there as well."

On appeal, defendant argues that the trial court erred in admitting under OEC 803(5) the police recordings of the witness interviews of Brown and Ritmiller, and erred in denying his demurrer on the basis that the six counts were improperly joined as alleged in the indictment. First, we address whether the trial court erred in denying defendant's demurrer, and then we turn to whether the trial court erred in admitting the police recordings of witness interviews under OEC 803(5).

## II.  ANALYSIS

### A.  *Demurrer*

ORS 132.560—the joinder statute—provides, as relevant:

> "(1)  A charging instrument must charge but one offense, and in one form only, except that:

> "* * * * *

> "(b)  Two or more offenses may be charged in the same charging instrument in a separate count for each offense if the offenses charged are alleged to have been committed by the same person or persons and are:

"(A)   Of the same or similar character;

"(B)   Based on the same act or transaction; or

"(C)   Based on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

"(2)   If two or more charging instruments are found in circumstances described in subsection (1)(b) of this section, the court may order them to be consolidated."

Under the joinder statute, "the state [is] required to allege in the charging instrument the basis for the joinder of the crimes that are charged in it, whether by *alleging the basis for joinder in the language of the joinder statute or by alleging facts sufficient to establish compliance with the joinder statute.*" *State v. Poston*, 277 Or App 137, 144-45, 370 P3d 904 (2016), *adh'd to on recons*, 285 Or App 750, 399 P3d 488 (2017) (emphasis added).

On appeal, defendant contends that "the trial court erred when it denied defendant's demurrer to the indictment based on improper joinder of charges." He argues that "the indictment on its face fails to meet the joinder requirements of ORS 132.560(1)(b)" because the indictment does not allege facts that the six charged offenses are either (1) of the same or similar character, (2) based on the same act or transaction, or (3) based on two or more acts or transactions connected together or constituting parts of a common scheme or plan. The state responds that the trial court did not err when it denied defendant's demurrer to his indictment because, "for an indictment to charge multiple crimes, the only allegation that ORS 132.560 requires is an allegation that the crimes were committed by the same person" and that the offenses were alleged to have occurred on the same date as the other offenses. We conclude that the trial court erred in denying defendant's demurrer because, under ORS 132.560(1)(b), Count 5, failure to perform the duties of a driver, and Count 6, unlawful possession of a firearm, were not properly joined in the indictment with Counts 1 through 3.

Here, Counts 1 through 3—attempted murder, first-degree attempted assault, and unlawful use of a weapon—

alleged defendant's unlawful use of a firearm, on the same day, in the same county, and against the same victim. Those counts were properly joined with each other. For example, we concluded in *State v. Meyer*, 109 Or App 598, 602-03, 820 P2d 861 (1991), *rev den*, 312 Or 677 (1992), that two DUII and three driving while suspended offenses spanning more than four years, "all major traffic crimes occurring in the same county and involving defendant's driving, [were] sufficiently 'similar' to meet the requirement for joinder under ORS 132.560(2) and ORS 132.560(1)(b)(A)." And in *State v. Rood*, 118 Or App 480, 482-83, 848 P2d 128, *rev den*, 317 Or 272 (1993), we concluded that a sodomy charge, a sexual-abuse charge, and an endangering the welfare of a minor charge, involving different victims, were of a similar character because each of those charges alleged sexual conduct by the defendant towards male children he had brought to his home for purposes of adoption. Thus, Counts 1 through 3 were properly joined.[4]

However, Count 5, the failure to perform the duties of a driver when property is damaged, was not properly joined in the indictment with Counts 1 through 3. With respect to that count, the indictment alleged only that defendant failed to perform the duties of a driver when property is damaged on the same day and in the same county as the other charges. There is nothing on the face of the indictment that indicates that defendant committed that crime while fleeing from the scene where the conduct in Counts 1 through 3 took place. Thus, based on the face of the indictment, Count 5 does not meet any of the requirements of ORS 132.560(1)(b). As a result, Count 5 was not properly joined in the indictment.

We also conclude that Count 6, unlawful possession of a firearm, was not properly joined in the indictment with Counts 1 through 3. Under Count 6, the indictment alleged that defendant "unlawfully and knowingly possess[ed] a handgun that was concealed and readily accessible to the defendant within a vehicle" on the same day and in the same county as the other charges. Count 6 did not involve

---

[4] We do not discuss Count 4, obliteration or change of identification number on firearms, because defendant was acquitted of that charge.

an individual victim, thus it is not of the "same or similar character" to Counts 1 through 3, which alleged the use of the gun against Royal. Additionally, there is nothing on the face of the indictment that connects defendant's unlawful possession of a firearm *concealed within a vehicle* with the crimes alleged in Counts 1 through 3. Consequently, based on the face of the indictment, Count 6 was not properly joined in the indictment.

Under Article VII (Amended), section 3, of the Oregon Constitution, we must nonetheless affirm defendant's convictions "if there is little likelihood that the error affected the verdict." *State v. Gibson*, 338 Or 560, 576, 113 P3d 423, *cert den*, 546 US 1044 (2005). The state argues that "any error in denying demurrer was harmless under *Poston* because evidence of all of the charged offenses was cross-admissible in this bench trial." Evidence that is presented at a trial on improperly joined charges

> "would be 'admissible,' as we used that term in *Poston*, in a hypothetical trial on each charge or properly joined group of charges, only when (1) each item of evidence that was actually presented could have been admitted in the hypothetical trial under a legally correct evidentiary analysis and (2) it is implausible that, had the defendant objected under OEC 403 or raised some other objection invoking the trial court's discretion, the trial court would have excluded that evidence in the hypothetical trial."

*State v. Clardy*, 286 Or App 745, 772-73, 401 P3d 1188 (2017). Thus, we turn to whether the error of joining Count 5 and Count 6 affected the verdict because the evidence on the improperly joined charges would not have been cross-admissible under that standard.

The trial court's error in joining Count 5 (the driving charge) did not affect the verdict on Counts 1 through 3 because evidence related to Count 5—that defendant fled the scene of an accident and ran from the car—would have been admissible evidence of defendant's mental state with regard to the charges that arose out of his shooting the gun at Royal, and it is implausible that the trial court would have excluded that evidence on a discretionary ground. Nor did the trial court's error in joining Count 6 (unlawful possession of a firearm) affect the verdict on Counts 1 through 3.

The evidence related to Count 6—that defendant unlawfully and knowingly possessed a gun that was concealed and readily accessible within a vehicle—would have been admissible evidence on Counts 1 through 3, which involved defendant's use of the gun he had concealed in his vehicle. It is also implausible that the trial court would have excluded that evidence on a discretionary ground. Consequently, the error in denying the demurrer was harmless with regard to Counts 1 through 3 because the error had no effect on the admissibility of the evidence that the factfinder could consider on those charges.

However, the converse is not true with regard to Count 5 or Count 6. We are not persuaded that the evidence related to Counts 1 through 3 would have been admissible at a trial in which defendant was charged only with Count 5—the failure to perform the duties of a driver when property is damaged. *See Poston*, 277 Or App at 146 ("We cannot conclude that the evidence bearing on the promoting-prostitution counts would have been admissible at a trial in which defendant was charged only with identity theft. Hence, we cannot conclude that the error in denying the demurrer did not affect the verdict on the identity-theft counts."). Likewise, we also cannot conclude that evidence related to Counts 1 through 3 would have been admissible at a trial in which defendant was charged only with Count 6—unlawful possession of a firearm. None of the evidence related to Counts 1 through 3 about the attempted shooting of Royal would be necessary to show that defendant knowingly possessed a concealed and readily accessible gun within a vehicle without a permit. The error of joining Count 5 (failure to perform the duties of a driver when property is damaged) and Count 6 (unlawful possession of a firearm) can be harmless only if the trial court did not consider the evidence related to Counts 1 through 3 when it found defendant guilty of Counts 5 and 6. *See State v. Klontz*, 257 Or App 684, 702-03, 308 P3d 214 (2013) (concluding that the harmless error analysis in a bench trial where the trial court failed to mention contested evidence when explaining its disposition is "contextually driven" and that we must ask, "Was the disputed evidence ultimately material to the resolution of issues disputed at trial?").

Here, it does not appear on the record whether the trial court as factfinder conducted a separate and distinct analysis of the evidence related to Counts 1 through 3, and the evidence related to Counts 5 and 6:

"[A]s to Count 1, Attempted Murder, I am finding him guilty based on the evidence that I heard. I didn't hear any credible evidence to dispute the intent that I heard through the other witnesses that I found credible. So I am going to enter a guilty finding on Count 1.

"Likewise, Count 2 and Count 3. Count 5 is Failure to Perform the Duties of a Driver, guilty. And Count 6 is guilty."

Because it is not clear that the trial court conducted a separate analysis of the evidence in its consideration of Count 5 and Count 6, the trial court's failure to deny defendant's demurrer was not harmless as to Count 5 and Count 6. Thus, we reverse defendant's convictions on Count 5, the failure to perform the duties of a driver when property is damaged, and Count 6, unlawful possession of a firearm. Because we do not reverse Counts 1 through 3 based on the trial court's denial of defendant's demurrer, we next address defendant's assignments of error to the admission of Brown's and Ritmiller's recorded police interviews under OEC 803(5).

B.  *OEC 803(5) Hearsay Exception*

"Hearsay is not admissible except as provided in [OEC 801 to OEC 806] or as otherwise provided by law." OEC 802. The exceptions to the general hearsay rule contained in OEC 803 are premised "upon the theory that a hearsay statement may possess such *circumstantial guaranties of trustworthiness* that the declarant need not be produced at the trial even though the declarant may be available." Legislative Commentary to OEC 803, *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 803.01[2], 777 (6th ed 2013) (emphasis added).

OEC 803(5) sets forth the hearsay exception for prior recollection recorded:

"A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and

accurately, shown to have been made or adopted by the witness when the matter was fresh in the memory of the witness and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an . adverse party."

The Legislative Commentary to OEC 803(5) stresses the indicia of reliability a prior recorded recollection holds when the declarant made the record "while events were still fresh in the mind and intended accurately to reflect them." Kirkpatrick, *Oregon Evidence* § 803.05[2], at 802. The Legislative Commentary also emphasizes that "[t]he rule does not require any particular method of establishing the initial knowledge of the declarant or the contemporaneity and accuracy of the record. These are left to be dealt with as the circumstances of the case may indicate." *Id.* at 803.

Admission is proper under OEC 803(5) when the trial court record shows that:

"(1) the witness now has insufficient recollection to testify fully and accurately; (2) the memorandum or record was made or adopted by the witness; (3) the making or adoption occurred at a time when the matter was fresh in the memory of the witness; and (4) the memorandum or record correctly reflects that knowledge."

*Id.* at 803. We address only the second foundational requirement—whether the memorandum or record was made or adopted by the witness—because our resolution of whether that requirement was satisfied is dispositive.

First, we consider whether Brown and Ritmiller *made* the records being introduced. Defendant does not dispute that Brown and Ritmiller "made the statements documented in the recordings," however, defendant argues that "they did not create the records themselves, as required by OEC 803(5)." Defendant contends that (1) "Brown and Ritmiller did not make the records, the police did" and (2) "there is no evidence that Brown or Ritmiller even knew that their interviews with the police were being recorded on video" and, therefore, they did not intentionally document their statements. Defendant argues that, "when a declarant has their statement surreptitiously captured on tape the

declarant cannot be said to be making a record in the sense contemplated by [the] recorded recollection hearsay exception, which assumes that the declarant is personally documenting the memory in writing."

The state responds that "a videotaped statement is 'made or adopted' by the witness-declarant even if some other individual physically initiates the recording process." The state argues that, "[w]hen the statement is reproduced in a record that is indisputably a verbatim representation—such as a videotape or audiotape—of the witness-declarant's out-of-court statement, the witness-declarant can fairly be said to have made the record." The state takes issue with defendant's argument, contending that such an argument turns on "who pressed the record button" and that "[s]uch an arbitrary rule bears no relationship to the rationale underlying OEC 803(5): no guarantee of trustworthiness is affected by the identity of the person who pressed the 'record' button on a video camera."

We disagree with the state's characterization of defendant's argument. Defendant is not proposing a rule that would have the exception turn on who pressed the record button. All exceptions to the hearsay rule are based on their having "circumstantial guaranties of trustworthiness [such] that the declarant need not be produced at trial even though the declarant may be available." Kirkpatrick, *Oregon Evidence* § 803.01[2], at 777. As defendant points out, and as we explain below, a recording created without the declarant's knowledge does not contain such a "circumstantial guarantee of trustworthiness" that the declarant is being truthful at the time of the recording.

As noted, OEC 803(5) requires that the proponent of the hearsay evidence show that the memorandum or record was "made or adopted by the witness." We begin with the question whether a witness can have "made" a record for the purpose of OEC 803(5) when there is no evidence that the witness was aware that his or her statements were being recorded. We have not yet had occasion to address that issue. To resolve it, we examine the text and context of the pertinent statutes and any helpful legislative history to discern the legislature's intention in enacting the

provisions. *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009).

We begin our analysis by emphasizing the difference between making a record and making a statement. OEC 803(5) requires the declarant to have made or adopted a "record," not a statement. Making a record requires the act of knowing that your statement is being recorded. The formality of knowing that your statement is being recorded makes the record more trustworthy than making a statement, which does not require knowledge that your statement is being recorded. Therefore, for a declarant to have made a "record" under OEC 803(5), the declarant must know that his or her statement is being recorded.

A plain reading of the text of OEC 803(5) supports the conclusion that a declarant cannot make a "record" without knowledge that his or her statement is being recorded, because to make a record under OEC 803(5), the declarant must act with the intention to bring about the existence of the record. The relevant dictionary definitions of "make" are:

> "2a: to bring about—used with that b: to cause to happen to be or experienced by someone * * * c: to cause to exist, occur, or appear: bring to pass: create, cause * * * d: to give rise to * * * 5: to frame or formulate in the mind: form as a result of calculation or design[.]"

*Webster's Third New Int'l Dictionary* 1363 (unabridged ed 2002). Thus, a declarant cannot have "made" a record about a matter—that is, cannot have caused the record to exist—unless, at a minimum, the declarant was aware that his or her statement was being recorded at the time the declarant made the statement.

Moreover, the context in which "made" appears in OEC 803(5) also indicates that the legislature intended that, for a declarant to make a record, the declarant must know that the record is being made. OEC 803(5) provides two means by which a record can be imbued with sufficient guarantees of trustworthiness: it can be made or adopted. From that context we know that "made" must be different from "adopt." By its plain meaning, adopt indicates to accept

or acknowledge a record.[5] Thus, by adopting a recording, a declarant may accept or acknowledge the accuracy of a record otherwise created without his or her direct involvement or knowledge. *See State v. Staley*, 165 Or App 395, 399-400, 995 P2d 1217 (2000) (police officer's report of interview with witness was not admissible under the hearsay exception for a prior recollection recorded when the witness "reviewed and approved" the officer's notes of the interview but never adopted the report itself, which was written one month after the interview). A declarant's adoption of a record thus provides a means of imbuing the recorded statements with sufficient guarantees of trustworthiness in the absence of such guarantees of trustworthiness provided by the declarant's intentional creation of the record. Consequently, we find further support for the conclusion that a declarant cannot make a record without knowing that his or her statements are being recorded in the pairing of "make" and "adopt" in the text of OEC 803(5).

Moreover, interpreting "made" to require that the declarant know that a record of his or her statements is being created is consistent with the legislative history of OEC 803(5). The Legislative Commentary stresses the indicia of reliability and the circumstantial guaranties of trustworthiness behind the prior recollection recorded hearsay exception. We struggle to find additional guarantees of trustworthiness when the declarant is recorded without the knowledge that he or she is being recorded. Indeed, the declarant may be under pressure to a make a particular statement regardless of its veracity. However, without the counter-pressure provided by the knowledge that the statement is being memorialized, the statement carries no greater indicia of trustworthiness than any other hearsay statement.

Thus, under these circumstances, we conclude that, for a witness to have "made" a record under OEC 803(5), the proponent of the hearsay evidence must, at a minimum, show that the witness was aware that he or she was being

---

[5] The relevant dictionary definitions of "adopt" are "2 a: to take up or accept esp. as a practice or tenet often evolved by another *** (2): to accept formally: acknowledge or enact as true, wise, fitting, germane." *Webster's* at 29.

recorded. Here, the state presented no evidence that Brown or Ritmiller were aware that they were being recorded at the time of their interviews. Therefore, neither Brown nor Ritmiller "made" their video-recorded statements for purposes of OEC 803(5).

Second, we consider whether Brown or Ritmiller *adopted* the recording of their respective interviews. There is no evidence that either Brown or Ritmiller adopted the recording before trial, and the trial court found that neither Brown nor Ritmiller could recall the events on the day of the shooting. Accordingly, we agree with defendant that there is no evidence that Brown or Ritmiller adopted their video-recorded statements "when the matter was fresh in their memory," as required by OEC 803(5).

In sum, we conclude that OEC 803(5) requires that the declarant know that he or she is being recorded for the declarant to have "made" the records being introduced under that exception. Here, the record does not support the trial court's implicit findings that Brown and Ritmiller either "made or adopted" their recorded statements. Therefore, the foundational requirements for admission under OEC 803(5) were not satisfied, and the trial court erred in allowing the recorded statements of the two witnesses to be admitted as evidence.

We also conclude that the admission of the recorded statements was not harmless with respect to defendant's convictions on Counts 1 through 3. Attempted murder (ORS 163.115) requires proof that defendant *intentionally* attempted to murder Royal, and attempted assault (ORS 163.185) requires proof that defendant *intentionally* attempted to cause serious physical injury to Royal. Likewise, unlawful use of a weapon required proof that defendant attempted to use the weapon unlawfully against another, or carried or possessed the weapon with the *intent* to use it unlawfully against another. The video-recorded statements of Brown and Ritmiller bore directly on whether defendant intended to shoot Royal. Hence, we cannot conclude that there is little likelihood that the admission affected defendant's convictions for attempted murder, attempted assault, and unlawful use of a weapon.

Convictions on Counts 1, 2, and 3 reversed and remanded; convictions on Counts 5 and 6 reversed; otherwise affirmed.